UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| ALICE BIBLE ) | |
| ) | |
| v. ) | NO. 2:14-CV-05 |
| ) | |
| PARKER HANNIFIN CORP. LTD ) | |
| BENEFIT FUND ) | |

## REPORT AND RECOMMENDATION

This is an action to recover long-term disability benefits under a "Welfare Benefit Plan" as defined by the Employer Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*. The district judge has directed the magistrate judge to review the administrative record and to file a report and recommendation regarding the parties' respective motions for summary judgment.[1]

Beginning June 27, 2005, plaintiff was employed by Parker Hannifin Corporation ("Defendant") as an Assembler/Cell B Operator. It is undisputed that defendant provided to

---

[1] Correlating the parties' citations to the Administrative Record in their respective briefs has been difficult because each of them used differing means to do so. Plaintiff referred to document numbers and page I.D.'s which were automatically implanted by the electronic case filing system of this court when the record was filed into ECF. Defendant, however, referred to the Bates numbering pagination system used for the record when it was first prepared, but before it was filed into ECF. To compound the problem, this report and recommendation necessarily must use one or the other methods, not both.

Of the two methods, plaintiff's is by far the most preferred since the record after all is filed in electronic form and now bears the numbering system assigned by ECF.

For future reference, defendant's counsel should refer to document numbers and pagination assigned by ECF in motions and briefs filed in ERISA cases.

its employees a benefit plan which included a Long-Term Disability Program; that defendant's plan was covered by the Employer Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*.; and that plaintiff was a "participant" in the Plan as defined by ERISA. Defendant was the Plan Administrator[2]. As Plan Administrator, defendant reserved to itself the authority to: make rulings; interpret the Plan; set procedures; and to gather medical information. However, defendant's plan also provided that each "Program," such as a long-term disability program, has its own "claims fiduciary" which has the discretionary authority to make final decisions on claims for benefits and appeals of denied claims. Defendant's claims fiduciary was Liberty Life Assurance Company ("Liberty").[3]

Defendant's long-term disability program[4] recites that an employee is eligible if she (1) experiences a qualifying disability while employed and which is covered by the Plan and (2) is still disabled after a six-month elimination period. Under the long-term disability plan, "Qualifying Disability" has two distinct definitions, each dependent on the period of time during which the disability persists. During the first two years of benefits, an employee is considered to be disabled under the Plan if the employee's condition prevents her "from performing the essential functions of [her] occupation, even with job accommodations" provided by defendant. Solely for the purposes of this report and recommendation, this initial two-year period will be referred to as "Phase I." After that initial two years of

---

[2] Doc. 15-1, p. ID 829.

[3] Doc. 15-1, p. ID 867.

[4] Doc. 15-1, p. ID 858.

2

receiving long-term disability benefits, the employee is entitled to a continuation of disability benefits only if she is "unable to perform the essential functions of [her] occupation *or any other occupation for which [she is] or could, with minimal training, become qualified*."[5] This disability period, again only for the purposes of this report and recommendation, will be referred to as "Phase II."

To sum up and paraphrase, during Phase I, an employee is disabled under the Plan if she is unable to perform her own occupation. During Phase II, she is disabled under defendant's Plan only if she is unable to perform *any* occupation for which she is qualified.[6] In determining whether an employee can perform the essential functions of any occupation, Liberty is to take into account the employee's education with regard to the level of education needed to perform an occupation; her training, or the need for additional training; her work experience with regard to any occupation; and her medical ability to perform that occupation with or without reasonable accommodation.[7]

On December 11, 2009, plaintiff submitted a claim for benefits under the defendant's Long Term Disability Plan due to "crippling abdominal pain and [severe] weight loss."[8] Those Phase I disability benefits were approved on December 29, 2009.[9] However, by letter

---

[5] Italics supplied.

[6] Doc. 15-1, p. ID 858.

[7] Id.

[8] Doc. 14-3, p. ID 785.

[9] Doc. 14-3, p. ID 780.

3

dated June 12, 2012, plaintiff was denied Phase II disability benefits beyond June 10, meaning of course that Liberty found that plaintiff was not precluded from working at *any* occupation for which she was qualified.[10] That denial was upheld through two levels of appeals.[11]

One of the cornerstones of ERISA litigation, developed by case law, is that reviewing courts are severely restrained in the evidence which may be considered in appraising the propriety of the actions of a claims administrator. Succinctly stated, district courts are not permitted to consider evidence which was not presented to the claims administrator. *See, Perry v. Simplicity Engineering*, 900 F.2d 963, 967 (6th Cir. 1990). This is true whether the standard of review is *de novo* or the "arbitrary and capricious" standard, and where the Benefit Plan clothes the administrator with discretionary authority to interpret its terms, including eligibility for benefits, the standard for review to be applied is the arbitrary and capricious test. *See, Johnson v. Eaton Corp*. 970 F2d 1569, 1574 (6th Cir. 1992).

The arbitrary and capricious of course is the standard to be applied here. This is a "highly deferential" standard of review. *Firestone Fire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, "highly deferential," as plaintiff points out, is not a mere rubber stamp for the decision of the claims administrator, *Swaback v. American Info Techs. Corp.*, 103 F3d 535, 540 (7th Cir. 1996). In other words, a claims administrator's action, if it has

---

[10] Doc. 14-2, p. ID 169.

[11] Doc. 14-2, p. ID 70.

some reasoned basis to uphold it, is not arbitrary and capricious. Conversely, if it has no reasonable underpinnings, *i.e.*, no rational basis, then it is by definition arbitrary and capricious.

It also is important to recall that the reviewing court is not to substitute its judgment for what was an otherwise reasoned decision by the claims administrator. Even if the court would have reached a different result after considering the evidence, the administrator's decision must be upheld if it was not arbitrary and capricious. *See, e.g., Michigan Affiliated Healthcare Systems v. Unum Life Insurance Co. of America,* 1997 U.S. Dist. Lexis 14123 (WDMI 1997).

Therefore, the question for this court to answer, looking only to the record considered by Liberty, is whether there was a reasonable basis to conclude that plaintiff was not disabled from working at any occupation after June 10, 2012.

On December 11, 2009, plaintiff weighed 170 pounds.[12] She began experiencing severe abdominal pain and a catastrophic loss of weight; by May 2010, she weighed only 88 pounds.[13] She suffered a mild stroke that same month.[14] Based on the medical records at that time, Liberty approved plaintiff's claim for Phase I long-term disability benefits which commenced on June 10, 2010.

Under the Plan, as of June 11, 2012, in order to continue receiving benefits, i.e., Phase

---

[12] Doc. 14-3, p. ID 644.

[13] Doc. 14-3, p. ID 654.

[14] Doc. 14-2, p. ID 102.

5

II benefits, plaintiff would have had to be disabled from *any* occupation which she was qualified, or for which she could become qualified with minimal training. Liberty concluded that plaintiff did not meet this qualifying definition, which plaintiff asserts was an arbitrary and capricious decision.

Plaintiff presents two arguments: (1) that Liberty acted arbitrarily and capriciously by failing to consider the observations and opinions of plaintiff's treating physicians; and (2) Liberty, by refusing to consider additional evidence presented to it during any appeals process, acted arbitrarily and capriciously.

It is a bit troubling that Liberty Mutual Insurance Company, which was charged with responsibility of determining eligibility for benefits, is the same entity which would have paid those benefits. A decision by Liberty to pay Phase II benefits would have hurt its financial bottom line. Conversely, by denying Phase II benefits, Liberty increased its profit margin. There can be no reasonable argument to the contrary - Liberty had a financial conflict of interest.

In *Metropolitan Life Insurance Company vs. Glenn*, 554 U.S. 105 (2008), the Supreme Court held that a conflict as just described is a "factor" for the court to consider in determining if the Administrator acted arbitrarily and capriciously in denying a claim. The court stressed that it is not an overriding factor, but just another factor to take into account with all the others.[15]

---

[15] 554 U.S. at 117.

Liberty's initial denial of Phase II benefits was based upon a report and recommendation of Dr. David Peterson; a Functional Capacity Evaluation (FCE) report of benchmark physical therapy; and a Vocational Skills Assessment by Rhonda Randolph.

Plaintiff's treating physician was Dr. Phillip Thwing, a family practitioner in Greeneville, Tennessee. On September 19, 2011, at which time plaintiff was well within the Phase I benefit period, Dr. Thwing submitted a report directly to Liberty in which he said: (1) that he last treated plaintiff on September 7, 2011; (2) that plaintiff was "improving medically;" (3) that she could perform "light" work by "lifting/carrying up to 20 pounds occasionally, sitting at least occasionally and standing/walking frequently."[16] Inexplicably, only two days later on September 21, 2011, Dr. Thwing submitted another report, this one addressed only "To Whom it May Concern," in which he stated:

> I have re-evaluated [plaintiff], and I no longer believe that she is able to perform even a sedentary occupation. She cannot lift a five lb. object with her left hand, she becomes fatigued with minimal exertion and cannot even get herself out of a bathtub without assistance. She is not able to drive at this time. Her improvement has been very, very slow.[17]

Plaintiff's counsel acknowledges that there is no explanation for these starkly incompatible reports by Dr. Thwing, but he maintains that Dr. Thwing's position thereafter remained steadfastly consistent with his second report, and Liberty acted arbitrarily and capriciously by failing to give it the weight that should be accorded the opinion of a treating physician.[18]

---

[16] Doc. 14-3, p. ID 508.

[17] Doc. 14-3, p. ID 501.

[18] Plaintiff's reply, doc. 23, p. 2.

Dr. David Peterson is retained by Liberty to review disability claims and to make recommendations to Liberty.[19] On January 12, 2012, Dr. Peterson submitted his report, ultimately concluding that plaintiff retained capacity for at least the Light Range of work.[20]

He reviewed all of plaintiff's medical records, including the records generated by Dr. Thwing, and he also personally telephoned Dr. Thwing on January 11, 2012, to discuss plaintiff's medical condition.[21] In addition to Dr. Thwing's records and his conversation with Dr. Thwing, Dr. Peterson also considered a report by Dr. Neil J. Sherman who, like Dr. Peterson, is a retained consultant for the Plan Administrator.[22] He also reviewed hospital andother medical records. He noted that plaintiff's history indicated that she dropped from 170 pounds to 103 pounds from July, 2009, until April 6, 2010; that she was treated for abdominal pain, gastric and colon ulcers, and a small bowel obstruction; that she underwent surgery for the small bowel obstruction, resulting in even a further weight loss to 95.8 pounds by May 21, 2010. He also noted that since that time she had regained all her weight and then some, weighing 177 pounds on September 7, 2011.[23]

After reviewing all of these records, as well as taking into account his conversation with Dr. Thwing, Dr. Peterson concluded that plaintiff was not as occupationally restricted

---

[19] Doc. 14-2, p. ID 249.

[20] Doc. 14-2, p. ID 246-250.

[21] Doc. 14-2, p. ID 246-250.

[22] *Id.,* at p. ID 248.

[23] *Id.*, p. ID 246.

8

as Dr. Thwing suggested in his last report, and that "reasonable restrictions and limitations would include no heavy lifting and carrying above 30 pounds occasionally and 20 pounds frequently due to the de-conditioning that accompanies her rapid weight loss," and there would be "no restrictions or limitations thought necessary for sitting, standing, walking, bending, stooping, or climbing steps." He opined that Dr. Thwing's proposed limitations were excessive in light of Dr. Thwing's failure to provide "an understandable explanation" for those restrictions during their telephone conversation.[24] Dr. Peterson also noted the inconsistent reports of Dr. Thwing which were dated a mere two days apart.

Perhaps this is the appropriate place to address plaintiff's suggestion that Dr. Peterson, since he is retained by Liberty to serve as a consultant, has an inherent conflict of interest that should require this court to give disproportionately more weight to Dr. Thwing's opinion than to Dr. Peterson's.

The court agrees that Dr. Peterson, by being a retained consultant, would have a motive to interpret facts and express opinions favorable to the entity who pays him. But plaintiff's physician in a very real sense also is retained, by the plaintiff, of course. He arguably has a motive to interpret circumstances in such a way as to favor his patient; after all, he presumably wants to keep plaintiff as a patient. Suffice it to say, neither physician has any more of a conflict than the other, unless this court is willing to presume that a physician hired by an insurance company is more likely to minimize or even ignore a plaintiff's

---

[24] *Id.*, p. ID 247.
9

symptoms than a treating physician would have to overemphasize or exaggerate his patient's symptoms. Without more, Dr. Peterson's relationship with Liberty is not particularly significant.

On January 31, 2012, Liberty required plaintiff to undergo a Physical Work Performance Evaluation, *i.e.*, a functional capacity evaluation, by Benchmark Physical Therapy of Greeneville, Tennessee. Since Benchmark is located in Greeneville, presumably it had no reason to do other than record its findings and state its opinions as objectively as it could. In addition to the tests it administered to plaintiff, Benchmark also took into account her subjective complaints of pain that she claimed to experience during the various maneuvers required of her. Benchmark reported to Liberty that plaintiff had the capability for a light range of work, but not for five eight-hour work days each week. However, Benchmark also concluded that plaintiff was capable of working a full forty hour work week within the sedentary range.[25]

On February 14, 2012, Rhonda Randolph, the Vocational Case manager for Liberty, performed a "Transferrable Skills Analysis."[26] Such an analysis is undertaken to ascertain if a disability claimant has the capability to perform any kind of work in light of the claimant's physical restrictions and limitations. In analyzing plaintiff's claim, Ms. Randolph used the restrictions discussed by Dr. Peterson and Benchmark Physical Therapy. She

---

[25] Doc. 14-2, p. ID 201.

[26] Doc. 14-2, p. ID 217.

10

ultimately concluded that plaintiff had the capability of working as a Small Products Assembler, Electronics Assembler, or as a cashier (ticket seller/amusement).[27]

Based on the information discussed in the preceding paragraph, Liberty determined that plaintiff was not entitled to Phase II benefits and so advised plaintiff by letter dated June 12, 2012.[28]

In addition to arguing that Liberty should accept Dr. Thwing's opinions over those of Dr. Peterson because (1) Thwing was plaintiff's treating physician, and (2) Peterson never personally examined plaintiff, much less treated her, she also argues that Ms. Randolph, the Vocational Case Manager, never conducted a survey to determine if any of the jobs she opined the plaintiff could perform actually were available in the Greeneville area. In other words, plaintiff suggests that since plaintiff lives in Greene County, Tennessee, any assessment of her vocational prospects should be relevant to the Greene County area.

The logic of this argument is undeniable, but unfortunately it makes no difference. Plaintiff essentially is asking that the Plan's language, "*any* other occupation for which she is qualified," be judicially amended to read, "any other occupation for which she is qualified *and which exists in plaintiff's immediate area*." The case cited by plaintiff in support of her contention that the court should construe the Plan's language to add such a requirement, *Urso v. Prudential Ins. Co. Am.*[29] is inapplicable to this case for any number of reasons, the most

---

[27] *Id.*, p. ID 218.

[28] Doc. 14-2, p. ID 169.

[29] 2004 WL 3355265 (D.N.H. 2004).

11

important of which is that it was reviewed under the *de novo* standard, not the arbitrary and capricious standard. In short, there are no cases cited by plaintiff, and none known to this court, which support plaintiff's position that a claims administrator is obligated to determine if the "any job" requirement must be limited to the immediate geographical area in which a claimant lives if the administrator has discretionary authority to determine eligibility for benefits under the Plan, and especially if the Plan itself has no such limitation, and this one does not.[30].

Plaintiff argues that Liberty failed to take into account that plaintiff was awarded disability benefits by the Commissioner of Social Security. That assertion is incorrect; Liberty did in fact consider that plaintiff was awarded Social Security disability benefits. Rather, Liberty did not agree with the decision of the Commissioner of Social Security, pointing out that it considered information which the Commissioner of Social Security did not have.[31]

Plaintiff takes issue with the report of Ms. Randolph, the Vocational Case Manager for Liberty, suggesting that Ms. Randolph's opinion that Small Products Assembler and Electronics Assembler "clearly" fall within the light range of work, not sedentary. Respectfully, this court has no independent knowledge of the range of work in which those two jobs would fall; plaintiff cites no authority in her brief; and she cites to no part of the

---

[30] *See*, Doc. 15-1, p. ID 858.

[31] Doc. 14-2, p. ID 93-94.

12

record to support this argument. Nothing else can be said.

Plaintiff insists that Liberty's failure to obtain an independent medical examination renders its decision arbitrary and capricious. Doubtlessly there are cases in which an independent medical examination should be required, but it is just as certain that not every case requires an independent medical examination. Here, all of plaintiff's records were considered by Dr. Peterson, including the two inconsistent reports of Dr. Thwing.

Plaintiff argues that Chuck Johnson, who conducted Liberty's first level appeal regarding denial of plaintiff's claim, stated that plaintiff's record were reviewed by Liberty's "Managed Disabilities Services Unit," but failed to disclose who or what that unit was in violation of 29 C.F.R. § 2506.503-1(h)(3)(iii) and (iv).

Defendant responds that the name of the Nurse Case Manager, Tammy Scarponi, in fact does appear in the record at Doc. 14-5, p. ID 755-56.

In looking at these pages in the record, Nurse Scarponi's name indeed does appear several times. However, it would take someone with the visual acuity of a Great Horned owl, and almost divine prescience, to find and appreciate the significance of these notations. Nevertheless, the failure to prominently identify Nurse Scarponi does not make Liberty's ultimate decision arbitrary and capricious.

It bears repeating that this court cannot - *must not* - substitute its judgment for that of Liberty under the arbitrary and capricious standard of review. This court, if reviewing this record *de novo*, *might* have reached a different result. Even if it is *likely* this court would have reached a contrary conclusion upon a *de novo* review of the record, it does not follow

13

therefrom that Liberty's decision was arbitrary and capricious. Liberty considered all the medical records in the record, and it cannot be said that Liberty's decision was devoid of a rational basis, and was therefore arbitrary and capricious. Liberty's financial stake in the outcome does not tip the balance the other way.

In conclusion, it is recommended that the defendant's motion for summary judgment, doc. 16, be granted, and that the plaintiff's motion for summary judgment, doc. 17, be denied.[32]

Respectfully submitted,

s/ Dennis H. Inman<br>United States Magistrate Judge

---

[32] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).